*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2014 UT 08
322 P.3d 728**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

ROBERT A. BAIRD,
*Petitioner and Appellee,*

*v.*

GLORIA BAIRD,
*Respondent and Appellant.*

No. 20120488
Filed March 7, 2014

Third District, Tooele Dep't
The Honorable Robert W. Adkins
No. 120300417

Attorneys:

Brandon Simmons, Salt Lake City, for appellee

Troy L. Booher, Clemens A. Landau, Salt Lake City, for appellant

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE LEE joined.

JUSTICE PARRISH, opinion of the Court:

### INTRODUCTION

¶1    Robert Baird sought and obtained a stalking injunction against his mother, Gloria Baird. The district court entered the three-year injunction after determining that Gloria's nearly daily phone calls to Robert were causing him emotional distress. On appeal, we are asked to determine whether the district court erred in entering the injunction based solely on its finding that Gloria's conduct was causing Robert emotional distress, without considering whether her conduct would have caused emotional distress to a reasonable person in Robert's circumstances. We are also asked to interpret the definition of emotional distress contained in the 2008 amendment to Utah Code section 76-5-106.5(2) (Stalking Statute) to determine whether it departs from or encompasses the definition of emotional distress previously recognized in *Salt Lake City v. Lopez*, 935 P.2d 1259 (Utah Ct. App. 1997).

¶ 2   We hold that the district court erred in applying a subjective rather than an objective standard to the Stalking Statute's emotional distress element.   We also clarify that the Stalking Statute's definition of emotional distress does not incorporate the *Lopez* definition.   We therefore vacate the stalking injunction and remand this matter to the district court for further proceedings consistent with this opinion.

### FACTUAL AND PROCEDURAL BACKGROUND [1]

¶ 3   Robert Baird is the adult son of Gloria Baird.   Robert has a seizure disorder and suffers from mental disabilities.   Robert's seizure disorder is well managed with medications,  but he still struggles with personal hygiene and money management,  needs reminders to take his medications, and suffers from anxiety.   While Robert lived in Gloria's home, he and Gloria were often in conflict.   As a result of the difficulties he was encountering at home, Robert desired to gain independence.   In October 2011, Robert moved out of Gloria's home and began living on his own.   Robert is enrolled in a program at Valley Mental Health to assist with his transition to independent living.

¶ 4   After Robert moved out of Gloria's home, Gloria contacted him almost daily.   She occasionally called late at night and called repeatedly if he did not answer.   During at least some of these phone calls, she yelled at him and reportedly threatened to take away his independence by seeking a guardianship and forcing him to return to live with her or in a group home.   Gloria also took Robert's social security income for two or three months and placed it in a separate bank account.

¶ 5   Robert sought law enforcement assistance but was told that he did not qualify for a protective order.   On February 29, 2012, Robert filed a request for a temporary civil stalking injunction against Gloria.   In his request, Robert stated that since he moved out of Gloria's home, Gloria "calls me continuously, screaming at me and threatening me to sign papers in order to go into a group home."   Robert included with his request several letters from Valley Mental Health employees.   Among the letter writers was Jodi Rushton, a social worker with Valley Mental Health. Rushton wrote that Robert had "repeatedly complained to [her] that his mother is constantly calling him, coming over to his apartment uninvited, and

---

[1]   These facts are based upon evidence presented at the April 20, 2012 evidentiary hearing.

demanding that he sign papers to place him in a group home . . . [and] threaten[ing] to take him to court if he does not sign the papers." Rushton further stated that Robert "wants his mother to 'stop harassing him' so that he can continue to concentrate on his recovery, and the positive improvement he continues to make." The district court granted the injunction that same day. The injunction was served on Gloria on March 2, 2012. Gloria immediately requested a hearing to challenge the injunction pursuant to section 77-3a-101(6) of the Utah Code.[2]

¶ 6    On April 20, 2012, the district court held an evidentiary hearing to determine whether Robert could satisfy his statutory burden of proving "by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." UTAH CODE § 77-3a-101(7). Both parties appeared at the hearing pro se, with the district court judge asking many of the questions.

¶ 7    Robert called three witnesses. The first was Robert's case manager at Valley Mental Health, Christine Hopkins. She testified that Gloria called Robert "frequently in the evenings," and if he did not answer, Gloria would keep calling. After Gloria would talk with him, Robert would call Hopkins and would be "quite upset." Hopkins also testified that Robert told her that he "finds it very distressing when [Gloria] does contact him." She stated that Robert had "been trying very hard to get out on his own and become more independent," but that Gloria's frequent contact was making his transition difficult because he felt that Gloria did not have "confidence that he [could] be independent." She further testified that, according to Robert, Gloria had been "trying to get him into a group home."

¶ 8    Next, Robert called his representative payee at Valley Mental Health, Michael Neil. Neil testified that Valley Mental Health encourages Robert "in any goals that he would like to make for himself," that Valley Mental Health would "continue to support" Robert as he works on "becoming more independent," and "[i]f there is any interference" then as an adult, Robert "has rights to pursue [his own] direction." Neil also testified that Robert had

---

[2] The stalking injunction provision allows a respondent to "request, in writing, an evidentiary hearing on the civil stalking injunction." UTAH CODE § 77-3a-101(6). "At the [evidentiary] hearing, the court may modify, revoke, or continue the injunction." Id. § 77-3a-101(7).

informed him that he would not like to have contact with his mother because "he feels that she is interfering with his daily life." Neil stated that contact with Gloria made Robert feel "stressed" and "invaded." He further testified that Robert "seems to function well," but "when his mother is involved in his life he feels micromanaged and feels like his freedoms are taken away, which causes him stress." Neil also described Robert as having "a lot of anxiety" in general, related, not only to his mother, but also to "his financial trouble" and his transition out of the Passages program at Valley Mental Health.

¶ 9   Finally, Lynn Smith, an employee of the Tooele Police Department, testified that when Robert sought the protective order against Gloria, he was "upset," and that it was "obvious that his relationship with his mother was causing him a great deal of anxiety and stress, and he indicated at the time that he was fearful."

¶ 10   Robert also testified himself and stated that he sought a civil stalking injunction because, although he loves his mother, he would "just like to have [his] own space." He testified that Gloria contacted him "almost every day." When asked whether he had ever told Gloria not to contact him, Robert testified that he was "too scared to say it to her" because of "some bad experiences" he previously had with Gloria. Robert was also asked whether his contact with Gloria caused him "stress or any anxiety," to which he responded, "Probably. Probably a little bit—a little bit of stress." On cross examination, Robert testified that when he was living with Gloria, they "would get into fights" and "would argue."

¶ 11   In response, Gloria called two witnesses and also testified herself. She first called her friend Iris Call. Call testified that Gloria would take Robert to his medical appointments, make sure his seizure disorder was well managed, and drive him to work. She also testified that in her opinion Gloria always "wish[es] the best for [her] kids."

¶ 12   Gloria next called Andrew Baird, another of her sons. Andrew testified that Gloria would "get upset" when he and his siblings would not do their chores or would not do what they are supposed to do, "but, other than that, [Gloria] seem[ed] to be very good." Andrew also testified the family took responsibility for Robert's transportation and had helped him find a job, but in terms of Robert's relationship with his family, he "prefer[ed] just about anybody over family."

¶ 13 Gloria also testified and described herself as Robert's "main caregiver." She stated that, in her opinion, "Robert needs a lot of care," which is why she had suggested he "go to a group home." She admitted that she "had some fights with Robert, because of his tantrums," but testified that her "main concern" was for Robert's health and safety.

¶ 14 At the end of the hearing, the district court concluded that Gloria had stalked Robert, stating, "[Robert] does not want contact, and at this point in his life [Gloria's] contact is causing him stress and emotional upset. I am satisfied that the elements for the stalking injunction have been met, that it is not in his best interests at this point to have that contact." The court further stated, "[Robert] is entitled to have his own life and make his decisions, and he has chosen to live alone, and [Gloria's] contact with him is causing him emotional upset, emotional disturbance and distress that meets the requirements for a stalking injunction." Based on these findings, the district court entered a civil stalking injunction against Gloria that does not expire until March 2, 2015.

¶ 15 Gloria appeals. We have jurisdiction pursuant to section 78A-3-102(3)(k) of the Utah Code. Both parties are now represented by counsel.

## STANDARD OF REVIEW

¶ 16 "The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusion." *Gutierrez v. Medley*, 972 P.2d 913, 914–15 (Utah 1998). When reviewing factual determinations, this court will only rule as a matter of law "if the evidence is so clear and persuasive that all reasonable minds would find one way." *Hall v. Anderson*, 562 P.2d 1250, 1251 (Utah 1977).

## ANALYSIS

¶ 17 Gloria argues that the district court misinterpreted Utah's Stalking Statute because (1) it granted the injunction based on its finding that Gloria's conduct was causing Robert emotional distress without finding that her conduct would have caused emotional distress to a reasonable person in Robert's circumstances and (2) it failed to properly interpret the statutory definition of emotional distress.

¶ 18 Robert argues that Gloria did not properly preserve her objection to the district court's interpretation of the Stalking Statute. He further argues that the district court correctly ordered the

injunction because it did find that Gloria's conduct would cause a reasonable person under the circumstances to suffer emotional distress. Finally, Robert argues that Gloria's challenges to the district court's factual findings should be rejected because Gloria failed to marshal the evidence.

¶ 19 Before considering the merits of Gloria's claim, we address Robert's preservation argument. Robert asserts that Gloria failed to preserve the issue of whether the district court erred in finding that Gloria had committed the offense of stalking. Gloria maintains she preserved this issue in her cross-examinations of Robert's witnesses, her testimony, and the testimony of her witnesses. She further argues that the issue was preserved when the district court interpreted the Stalking Statute and ruled that "the elements for the stalking injunction [had] been met."

¶ 20 "We generally will not consider an issue unless it has been preserved" in the court below. *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828. Preservation turns on whether the district court "has an opportunity to rule on [an] issue." *Pratt v. Nelson*, 2007 UT 41, ¶ 15, 164 P.3d 366 (internal quotation marks omitted). Here, as part of its decision to enter a stalking injunction against Gloria, the district court was required to consider whether Robert had shown by a preponderance of the evidence that Gloria had stalked him. UTAH CODE § 77-3a-101(7). Thus, the district court necessarily had to consider whether Robert had established each element of a stalking offense. Because the district court considered and did in fact rule that Robert had established each of the statutory requirements for a stalking injunction, we conclude that the issue was adequately preserved.

¶ 21 We now turn to the merits. We hold that the district court erred by focusing solely on whether Gloria's conduct subjectively caused Robert emotional distress. The proper inquiry under the Stalking Statue is an objective inquiry into whether Gloria's conduct would have caused a reasonable person in Robert's circumstances emotional distress. We therefore remand the case to the district court for an objective determination of whether Gloria's conduct met the statutory requirement. Because we remand to the district court for this reason, we need not reach the claim that the district court misinterpreted the statutory definition of emotional distress by failing to consider the elements recognized in *Salt Lake City v. Lopez*, 935 P.2d 1259 (Utah Ct. App. 1997). However, because the district court will need to determine the elements of emotional distress on remand, we address that issue for the purpose of giving guidance to

the district court. In so doing, we hold that the Stalking Statute's definition of emotional distress does not incorporate the standard set forth in *Lopez*.[3]

## I. THE STALKING STATUTE REQUIRES A SOLELY OBJECTIVE INQUIRY INTO WHETHER GLORIA'S CONDUCT WOULD CAUSE A REASONABLE PERSON IN ROBERT'S CIRCUMSTANCES EMOTIONAL DISTRESS

¶ 22   We first consider Gloria's argument that the district court erred in applying a subjective, rather than an objective, standard to the Stalking Statute's emotional distress requirement. Utah's civil stalking statute allows for the issuance of a temporary, ex parte injunction upon a petitioner's showing of a "reason to believe that an offense of stalking has occurred." UTAH CODE § 77-3a-101(5)(a). It also provides for entry of a permanent injunction after a hearing if the petitioner establishes "by a preponderance of the evidence that stalking of the petitioner by the respondent has occurred." *Id*. § 77-3a-101(7). Thus, the essential statutory element is proof of "stalking."

¶ 23   Utah's Stalking Statute defines the crime of stalking as follows:

> A person is guilty of stalking who intentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause *a reasonable person*: (a) to fear for the person's own safety or the safety of a third person; or (b) to suffer other emotional distress.

*Id.* § 76-5-106.5(2) (emphasis added). The Stalking Statute defines "reasonable person" as "a reasonable person in the victim's circumstances." *Id.* § 76-5-106.5(1)(e).

¶ 24   The Model Stalking Code, upon which Utah's Stalking Statute is based,[4] explains that the offense of stalking does not focus

---

[3] Because we conclude that the district court incorrectly interpreted the Stalking Statute and remand for proceedings consistent with the standards clarified in this opinion, we need not address Robert's marshaling arguments.

[4] *House Floor Debate*, H.B. 493, 57th Utah Leg., 2008 Gen. Sess. (Feb. 29, 2008) (statement of Rep. Lorie D. Fowlke) (noting that the proposed legislation conformed to model legislation designed to
(continued...)

on the "particular emotional distress [a particular victim] suffers," but rather on how the defendant's conduct "would affect a 'reasonable' person." NAT'L CTR. FOR VICTIMS OF CRIME, THE MODEL STALKING CODE REVISITED: RESPONDING TO THE NEW REALITIES OF STALKING 37 (2007) (internal quotation marks omitted), *available at* http://www.victimsofcrime.org/docs/src/model-stalking-code.pdf?sfvrsn=0. Thus, to qualify for an injunction under the Model Stalking Code, a petitioner must meet an objective—not subjective—standard. Utah's Stalking Statute conforms to the Model Stalking Code's "solely objective" standard. *Id.* In this regard, the Model Code and the Utah Stalking Statute differ from statutes of other states that explicitly require both an objective *and* a subjective analysis.[5] The comments to the Model Code explain that the shift to a solely objective standard was motivated by the fact that a subjective standard "places an unnecessary burden on . . . victims, . . . forcing the victim to have to justify his or her fear [or distress] in the presence of the perpetrator." *Id.* at 36. Furthermore, a subjective standard "inappropriately punishes only those stalkers who have 'successfully' caused the victim fear [or distress]." *Id.*

¶ 25 Under the Stalking Statute's solely objective standard, the subjective effect of the respondent's conduct on the petitioner is irrelevant. Rather, the petitioner must establish only that the respondent's conduct would cause emotional distress to a reasonable person in the petitioner's circumstances.

¶ 26 The parties in this case disagree as to what the district court may consider in applying this objective standard. By including "in the victim's circumstances" as part of the "reasonable person" definition, the Stalking Statute provides for an individualized

---

[4] (...continued)
update stalking statutes to reflect the current stalking practices including cyber stalking); *Senate Floor Debate*, H.B. 493, 57th Utah Leg., 2008 Gen. Sess. (Mar. 5, 2008) (statement of Sen. Curtis B. Bramble) (same).

[5] *See, e.g.*, NEV. REV. STAT. § 200.575(1) ("A person who . . . engages in a course of conduct *that would cause a reasonable person* to feel terrorized, frightened, intimidated, harassed or fearful for the immediate safety of a family or household member, *and that actually causes the victim* to feel terrorized, frightened, intimidated, harassed or fearful for the immediate safety of a family or household member, commits the crime of stalking." (emphasis added)).

objective standard. *See Cooper v. Cooper*, 144 P.3d 451, 456 (Alaska 2006) (explaining that the "objective standard [applied to stalking cases] is individualized"). Under this standard, a court must consider the entire context surrounding defendant's conduct. *Ellison v. Stam*, 2006 UT App 150, ¶ 27, 136 P.3d 1242. When considering the context surrounding the respondent's conduct, acts that seem perfectly innocent or even well intentioned may constitute stalking. NAT'L CTR. FOR VICTIMS OF CRIME, *supra* at 37. For example, conduct such as sending the victim a dozen roses "may seem benign and loving to the casual observer," but could "mean a very different thing" when "understood in the context of the victim's experience." *Id.*

¶ 27 Courts applying this individualized objective standard have considered such factors as the victim's background,[6] the victim's knowledge of and relationship with the defendant,[7] any history of abuse between the parties,[8] the location of the alleged stalking and its proximity to the victim's children, if any,[9] and the cumulative effect of defendant's repetitive conduct.[10] Furthermore, under an individualized objective standard, a court may consider whether the defendant "ha[d] knowledge of a particular vulnerability of the victim and then act[ed] with full knowledge of the victim's vulnerability." *State v. Phelps*, 967 P.2d 304, 311 (Kan. 1998). When assessing these and other relevant factors, however, courts must avoid succumbing to a purely subjective analysis, which is inconsistent with the objective standard's intent to "protect[] against criminalizing conduct that only an unreasonably sensitive or paranoid victim would find harassing" so as to reduce the risk of "a truly innocent defendant falling within the ambit of [a stalking statute]." *State v. Orsello*, 554 N.W.2d 70, 79 (Minn. 1996) (Stringer, J., dissenting).

---

[6] *H.E.S. v. J.C.S.*, 815 A.2d 405, 417 (N.J. 2003).

[7] *State v. Hinchliffe*, 987 A.2d 988, 997 (Vt. 2009).

[8] *Cesare v. Cesare*, 713 A.2d 390, 394 (N.J. 1998) ("[A] court should regard any past history of abuse by a defendant as part of a plaintiff's individual circumstances and, in turn, factor that history into its reasonable person determination.").

[9] *Roper v. Shovan*, 2013 UT App 124, ¶ 5, 302 P.3d 483.

[10] *Coombs v. Dietrich*, 2011 UT App 136, ¶ 13, 253 P.3d 1121.

¶ 28 In considering Robert's request for an injunction, the district court repeatedly focused on the fact that Gloria's conduct was subjectively "causing [Robert] emotional upset and distress," which the court found sufficient to "meet[] the requirements for a stalking injunction." In so doing, the district court applied the incorrect legal standard. The court failed to determine, based on inferences drawn from the evidence, whether Gloria's conduct would cause a reasonable person in Robert's circumstances to suffer emotional distress. We therefore remand this case to the district court for consideration under the appropriate objective standard.

¶ 29 We note that remand is appropriate in this case because "whether the defendant engaged in a course of conduct . . . that would cause a reasonable person" emotional distress "is a question of fact." *State v. Gubitosi*, 886 A.2d 1029, 1037–38 (N.H. 2005). When confronted with questions of fact, this court will only rule as a matter of law "if the evidence is so clear and persuasive that all reasonable minds would find one way." *Hall v. Anderson*, 562 P.2d 1250, 1251 (Utah 1977); *see also Glew v. Ohio Sav. Bank*, 2007 UT 56, ¶ 18, 181 P.3d 791 ("[When] the trial court's findings include inferences drawn from the evidence, we will not take issue with those inferences unless the logic upon which their extrapolation from the evidence is based is so flawed as to render the inference clearly erroneous.").

¶ 30 From our review of the record, we conclude that the evidence is such that reasonable minds could disagree on the issue of whether Gloria's conduct would cause emotional distress to a reasonable person in Robert's circumstances. And because a determination of reasonableness is highly fact dependant, remanding supports our presumption that "the trial judge, having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties, is in a better position to perceive the subtleties at issue than we can looking only at the cold record." *State v. Calliham*, 2002 UT 86, ¶ 23, 55 P.3d 573. This is particularly true in a case like this one where the record consists almost entirely of evidence presented at an evidentiary hearing.

¶ 31 We further note for purposes of guidance on remand that, under the Stalking Statute, "it is not a defense" that the alleged stalker "was not given actual notice that the course of conduct was unwanted." UTAH CODE § 76-5-106.5(4)(a). Permitting such a defense would require a victim to "confront or try to reason with the [stalker]," which could be "dangerous and may unnecessarily increase the victim's risk of harm." NAT'L CTR. FOR VICTIMS OF CRIME,

*supra* at 52. In this case, Robert testified that he never asked Gloria to stop contacting him because he was "too scared to say it to her." But evidence that Gloria lacked actual notice that her conduct was unwanted is irrelevant to a determination of whether she stalked Robert.

¶ 32   In summary, we reverse and remand to the district court with directions to apply the appropriate objective standard to its emotional distress determination. This standard permits the district court to look at the context surrounding Gloria's conduct, including such factors as Robert's history and relationship with Gloria, Gloria's knowledge of Robert's vulnerabilities, and any other objective factors relating to Robert's disability. But we stress that, on remand, the district court must avoid assessment of purely subjective factors.

## II. THE STALKING STATUTE'S DEFINITION OF EMOTIONAL DISTRESS DOES NOT INCORPORATE THE DEFINITION RECOGNIZED IN *SALT LAKE CITY v. LOPEZ*

¶ 33   Gloria also argues that the district court misinterpreted the statutory definition of "emotional distress" when it found that her conduct met the requirements of a stalking injunction. In response, Robert argues that the evidence was sufficient to find that Gloria's conduct would cause a reasonable person emotional distress, regardless of which definition the district court applied. The record does not reflect the definition of emotional distress applied by the district court. Nevertheless, because the definition will be at issue on remand, we address it here. *See State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.").

¶ 34   Prior to 2008, the Stalking Statute did not explicitly define emotional distress. Utah courts interpreting the Stalking Statute relied on a 1997 court of appeals decision, *Salt Lake City v. Lopez*, which extended the tort definition of emotional distress to the stalking context. 935 P.2d 1259, 1264 (Utah Ct. App. 1997). *Lopez* held that emotional distress under the Stalking Statute "results from conduct that is outrageous and intolerable in that it offends the generally accepted standards of decency and morality." *Id.*(internal quotation marks omitted). Thus, the critical inquiry under the *Lopez* standard was whether the respondent's conduct rose to the level of "outrageous and intolerable."

¶ 35   In 2008, the Legislature added a definition of emotional distress to the Stalking Statute. That definition, which closely resembles the Model Stalking Code's definition, provides,

"'Emotional distress' means significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required." UTAH CODE § 76-5-106.5(1)(d); *see also* MODEL STALKING CODE FOR THE STATES § 3(b) (defining emotional distress as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling"). We have yet to address whether this statutory definition of emotional distress incorporates the common-law standard set forth in *Lopez*.[11] In addressing this issue, it bears emphasizing that this court owes no deference to the court of appeals' *Lopez* decision, and because this court has never interpreted the amended Stalking Statute, this issue presents a matter of first impression.

¶ 36   When interpreting statutes, we first give effect to the plain meaning of the statutory language. *Weber Cnty. v. Ogden Trece*, 2013 UT 62, ¶ 35, ___ P.3d ___ .   Where the plain language is clear and unambiguous, the inquiry is complete and " we do not look to other interpretive tools." *T-Mobile USA, Inc. v. Utah State Tax Comm'n*, 2011 UT 28, ¶ 21, 254 P.3d 752.   We therefore begin by looking to the Stalking Statute's plain language.

¶ 37  As amended in 2008, the Stalking Statute includes a comprehensive list of defined terms, including, as mentioned above, "emotional distress." UTAH CODE § 76-5-106.5(1)(d). While the *Lopez* emotional distress standard focuses on the severity of the *respondent's conduct*, the statutory definition of emotional distress looks solely to the nature of the *claimant's injury* — that is, the injury must amount to "significant mental or psychological suffering." *Id.* § 76-5-106.5(1)(d).   The statute limits the type of conduct that

---

[11] Several recent court of appeals cases have recognized the need for clarification on this issue. *Coombs v. Dietrich*, 2011 UT App 136, ¶ 11 n.2, 253 P.3d 1121 ("[D]ue to recent amendments to the Stalking Statute, the emotional distress requirement may have changed. . . . But . . . we do not  reach that issue."); *Bott v. Osburn*, 2011 UT App 139, ¶ 18, 257 P.3d 1022 ("The Utah appellate courts have not yet had occasion to decide whether *Lopez* is still relevant in light of the legislature's subsequent adoption of a statutory definition of emotional distress."); *Allen v. Anger*, 2011 UT App 19, ¶ 16 n.4, 248 P.3d 1001 ("Whether [the 2008 Stalking Statute's emotional distress] definition is intended to overrule the outrageousness requirement imposed by [*Lopez*] . . . [is] beyond the scope of today's decision.").

constitutes stalking separately through its definition of "course of conduct." *Id.* § 76-5-106.5(1)(b). The statute defines "course of conduct" as "two or more acts directed at or toward a specific person," which include:

> (i) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about a person, or interferes with a person's property: (A) directly, indirectly, or through any third party; and (B) by any action, method, device, or means; or
>
> (ii) when the actor engages in any of the following acts or causes someone else to engage in any of these acts: (A) approaches or confronts a person; (B) appears at the person's workplace or contacts the person's employer or coworkers; (C) appears at a person's residence or contacts a person's neighbors, or enters property owned, leased, or occupied by a person; (D) sends material by any means to the person or for the purpose of obtaining or disseminating information about or communicating with the person to a member of the person's family or household, employer, coworker, friend, or associate of the person; (E) places an object on or delivers an object to property owned, leased, or occupied by a person, or to the person's place of employment with the intent that the object be delivered to the person; or (F) uses a computer, the Internet, text messaging, or any other electronic means to commit an act that is a part of the course of conduct.

*Id.*[12]

¶ 38    This extensive list of prohibited conduct leaves no room for the common-law standard adopted by *Lopez*. Were we to read into the statute the *Lopez* definition of emotional distress, we would effectively be amending the statutory standard to require proof of

---

[12] Gloria has not argued that her conduct falls outside the scope of this definition; indeed, by "communicat[ing] to or about" Robert on several occasions, Gloria has engaged in acts that fit squarely within the list of explicitly covered conduct. UTAH CODE § 76-5-106.5(1)(b). Therefore, her defense rests solely on the claim that her conduct would not cause a reasonable person in Robert's circumstances to suffer emotional distress.

outrageous and intolerable stalking. We acknowledge that stalking laws and tort law overlap in their use of the term "emotional distress" to describe the kind of injury to a claimant that is vindicated or protected against. But the overlap ends there. The Stalking Statute and the common law prescribe distinct standards for the kind of conduct that triggers liability for such injury, and the clear and unambiguous statutory language preempts supplementation by the common law. The statute leaves no room for a requirement of proof of "outrageous and intolerable" conduct.[13]

¶ 39    Accordingly, we hold that the 2008 amendment to the Stalking Statute supplants the *Lopez* decision insofar as *Lopez* held that emotional distress in the stalking context "results from conduct that is outrageous and intolerable in that it offends the generally accepted standards of decency and morality." 935 P.2d at 1264 (internal quotation marks omitted). Instead, a petitioner seeking a civil stalking injunction must show by a preponderance of the evidence that a reasonable person in the petitioner's circumstances would have experienced "significant mental or psychological suffering" as a result of the respondent's alleged course of conduct. UTAH CODE § 76-5-106.5(1)(d).

¶ 40    In this case, it is unclear which definition of emotional distress the district court invoked. In its analysis, the court merely

---

[13] Gloria argues that the Model Stalking Code "suggests that section 76-5-106.5 codified the *Lopez* definition" of emotional distress because the drafters "recognized with approval" case law that, like *Lopez*, imported the definition of emotional distress from tort law. However, the comments to the model code express approval of stalking case law that, unlike *Lopez*, relied on section 46 of the Restatement (Second) of Torts to define emotional distress. NAT'L CTR. FOR VICTIMS OF CRIME, THE MODEL STALKING CODE REVISITED: RESPONDING TO THE NEW REALITIES OF STALKING 49 (2007). Section 46 defines emotional distress as including "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965); *see also Wallace v. Van Pelt*, 969 S.W.2d 380, 386 (Mo. Ct. App. 1998) (applying section 46's definition of emotional distress to Missouri's stalking laws). Neither the Model Stalking Code nor the cases it cites suggest that emotional distress includes an "outrageous and intolerable" conduct requirement.

stated that Robert did not want contact with Gloria and that "at this point in Robert's life [Gloria's] contact is causing him stress and emotional upset." The district court similarly stated that "Robert is entitled to have his own life and make his own decisions" and that Gloria's "contact with him is causing him emotional upset, emotional disturbance and distress that meets the requirements for a stalking injunction." Missing from this analysis is any discussion of whether Gloria's conduct would cause a reasonable person in Robert's circumstances significant mental or psychological suffering. We therefore direct the district court on remand to apply the statutory definition of emotional distress to determine whether Robert has established the elements of stalking by a preponderance of the evidence.

## CONCLUSION

¶ 41    The district court erred when it concluded that Robert had satisfied the statutory elements for a stalking injunction based solely on the subjective determination that Gloria's conduct was causing Robert emotional distress. The Stalking Statute requires that the district court determine whether Gloria's conduct would cause a reasonable person in Robert's circumstances emotional distress. And the Stalking Statute's definition of emotional distress supersedes the definition recognized in *Lopez*. Under the statutory definition, emotional distress means significant mental or psychological suffering. There is no requirement that the emotional distress arise from outrageous and intolerable conduct by the respondent. We therefore vacate the stalking injunction and remand for further proceedings consistent with this opinion.